UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TREIZY TREIZON LOPEZ, | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | No. 3:18-cv-1907 (KAD) |
| | : | |
| SCOTT SEMPLE, et al. | : | |
| *Defendants*. | : | January 4, 2019 |

_____

## <u>INITIAL REVIEW ORDER</u>

On November 23, 2018, the Plaintiff, Treizy Treizon Lopez, an inmate currently

confined at the Northern Correctional Institution in Somers, Connecticut, brought a civil

action *pro se* under 42 U.S.C. § 1983 against ten Connecticut Department of Correction

("DOC") officials in their individual and official capacities:  Commissioner Scott

Semple, District Administrator Edward Maldonado, Warden Kenneth Butricks, Captain

Salvatore, Correction Officer Lis, Correction Officer Garibaldi, Correction Officer

White, Counselor Mala, Counselor Fortin, and Lieutenant Eberle.  Compl. (DE#1).  The

Plaintiff is suing the Defendants for violating his First, Fourth, Eighth, and Fourteenth

Amendment rights while he was confined at the Manson Youth Institution ("MYI") in

Cheshire, Connecticut and the MacDougall-Walker Correctional Institution ("MWCI") in

Suffield, Connecticut.  He seeks monetary, injunctive, and declaratory relief.  On

December 5, 2018, Magistrate Judge William I. Garfinkel granted the Plaintiff's motion

to proceed *in forma pauperis*.  *See* Order No. 8.

### Standard of Review

Under 28 U.S.C. § 1915A, the Court must review prisoner civil complaints and

dismiss any portion of the complaint that is frivolous or malicious, that fails to state a

claim upon which relief may be granted, or that seeks monetary relief from a Defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the Defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570. Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

**Allegations**[1]

In April of 2018, while being transferred from MYI to the Bridgeport Correctional Center ("BCC"), the Plaintiff was found to be in possession of compact discs ("CDs"), which are considered contraband. Compl. ¶ 88. A correction officer at BCC gave the Plaintiff an ultimatum of either revealing the identity of the person who gave him the CDs or receiving a Class A disciplinary report ("DR") for possession of contraband. *Id.* Because the Plaintiff was unwilling to cooperate with the staff, he was placed in segregation immediately upon his arrival at BCC. *Id.* The following day, the Plaintiff was released from segregation, and his Class A DR was reduced to a Class B DR. *Id.* at ¶ 89.

---

[1] The plaintiff's complaint is 51 pages in length. The Court summarizes the allegations herein. However, the Court's decision is based upon a thorough review of all of the allegations.

On June 20, 2018, the Plaintiff was transferred from BCC back to MYI without notice that most of his personal property would be left behind at BCC. Compl. ¶¶ 14-15. He asked Correction Officer White why he had not been provided with all of his property. *Id.* at ¶ 17. White told the Plaintiff that, when the rest of his property arrives from BCC, it would have to be inspected by Correction Officer Lis because the Plaintiff was previously found to be in possession of contraband. *Id.* The Plaintiff signed for the property that had arrived and proceeded to his housing unit. *Id.*

The next day, the remaining property arrived at MYI. Compl. ¶ 18. Although it had already been inspected at BCC and cleared of any contraband, Correction Officer White conducted another search and found a one-dollar bill, another contraband item. *Id.* at ¶¶ 19-20. The bill was discovered in a manila envelope that belonged to the Plaintiff. *Id.* at ¶ 21. After White's search, the Plaintiff's property was stored in the MYI storage room. *Id.* at ¶ 19.

On June 26, Officer Lis conducted another "targeted search" of the Plaintiff's property, even though it had been stored in the storage room and was only accessible to MYI staff. Compl. ¶¶ 23-24. As a result of the search, the Plaintiff was brought to segregation and placed on administrative detention pending a security risk group ("SRG") affiliation. *Id.* at ¶ 26. He received a DR for the SRG affiliation, and Officer White issued him a DR for possession of contraband for the one-dollar bill that was discovered in his personal items. *Id.* at ¶¶ 26-27. The Plaintiff was placed in segregation, but he never received copies of the DRs or any other written notice of the allegations. *Id.* at ¶¶ 29-30.

While housed in segregation at MYI, the Plaintiff asked Correction Officer Garibaldi for copies of the DRs for his review. Compl. ¶ 31. He also requested that White and Lis be interviewed as witnesses for his disciplinary hearing. *Id.* Garibaldi denied both requests but told the Plaintiff that he would dismiss the DRs if the Plaintiff gave him information on how CDs were being smuggled into MYI. *Id.* The Plaintiff refused to provide any information to Garibaldi and told him that he needed Lis's and White's testimony and copies of the DRs for his defense. *Id.* at ¶¶ 31-32. Garibaldi replied, "[Correction Officers] cannot be witnesses and there's no need for you to see any evidence because no matter what we're going to make sure the [disciplinary hearing officer] smokes you since you wanna make [our] job harder." *Id.* at ¶ 32. Garibaldi also told the Plaintiff that a DR for SRG affiliation could not be challenged unless it is the inmate's first offense and that, if he does not plead guilty to that DR, he would receive another DR for disobeying a direct order. *Id.* at ¶ 33.

Because of what Garibaldi told him, the Plaintiff pleaded guilty to the SRG DR out of fear of receiving another DR for disobeying a direct order. Compl. ¶ 34. He pleaded not guilty to the contraband DR issued by White. *Id.* at ¶ 35.

Garibaldi assigned Counselor Mala to be the Plaintiff's advisor for the contraband DR hearing instead of allowing the Plaintiff to choose from a list of advocates per DOC policy. Compl. ¶ 36. Mala interviewed the Plaintiff shortly before his hearing. *Id.* at ¶ 37. During the interview, the Plaintiff asked Mala to seek information from Lis and White, but Mala told him that correction officers were "not allowed to be . . . witnesses [for inmates] and [that] there's no need for an investigation because we all know you'r[e] guilty." *Id.* at ¶ 38. Mala was later relieved of his duty as the Plaintiff's advisor and

replaced with Counselor Grey just minutes for the disciplinary hearing on July 10, 2018. *Id.* at ¶¶ 40-41.

On the day of the hearing, the Plaintiff met briefly with Counselor Grey, who also told him that correction officers could not serve as witnesses for inmates and refused to do any investigation because the hearing was only minutes away. Compl. ¶ 41. The Plaintiff was then "rushed into" Captain Salvatore's office for the hearing and appeared before Salvatore and Lieutenant Eberle, the disciplinary hearing officer. *Id.* at ¶ 42. During the hearing, he asked Salvatore and Eberle why he had not been shown any of the evidence against him or why Lis and White had not been interviewed per his request. *Id.* at ¶ 43. Eberle responded that correction officers were not permitted to be witnesses, that it was the Plaintiff's word against that of staff members, and that he was "going to have to take staff's word and find [the Plaintiff] guilty due to the fact that [he] was [previously] caught with CDs." *Id.* Salvatore agreed with Eberle's decision. *Id.* Thus, the Plaintiff was found guilty of the contraband DR. *Id.*

Before leaving Salvatore's office and returning to the segregation unit, the Plaintiff asked Salvatore and Eberle whether the guilty finding would have any effect on his SRG program placement. Compl. ¶ 46. Eberle told him that his SRG placement would be determined by a separate classification hearing. *Id.* However, the Plaintiff was never given a separate classification hearing for his SRG placement. *Id.* at ¶ 47.

As a result of both guilty findings, the Plaintiff received as sanctions twenty-eight days of punitive segregation and 115 days loss of phone and commissary privileges. Compl. ¶¶ 49-50. The Plaintiff spent twenty-two of those days on administrative

detention and the remaining six days on transfer detention, awaiting his transfer to the SRG program. *Id.* at ¶ 51.

During his time in segregation at MYI, the Plaintiff lost several privileges, including legal calls, mail, visitations, exercise, fruit, dessert, dinner snack juice, writing utensils, inmate request forms, and laundry services. Compl. ¶¶ 54, 56-58, 65-66, 79-80. He was provided with only one set of clean clothing per week and forced to shower in unsanitary conditions and with cold water. *Id.* at ¶ 59, 69. The cells in the segregation unit were unclean, smelled of urine and feces, and contained several insects. *Id.* at ¶¶ 60, 63. The Plaintiff was told by correction officers that, if he killed any of the insects, he would be issued another DR. *Id.* at ¶ 63. The bed in the Plaintiff's cell was rusted and contained dirty sheets and blankets. *Id.* at ¶ 61. The segregation unit was also freezing, and when the Plaintiff complained about the temperature to Salvatore and Counselor Fortin, the Defendants told him to "stop bitching" and to "grow some balls. You're in jail. You're not supposed to like it." *Id.* at ¶ 71.

While in segregation, the Plaintiff "was denied any means to practice his religion [and] deprived [of] any form of religious services . . . ." Compl. ¶ 85. Any religious material that he requested during his time in segregation was denied by correctional staff. *Id.* The Plaintiff was also denied medical treatment for his dry skin and rashes and his inhaler, which caused him to endure difficulty breathing. *Id.* at ¶¶ 81, 112-13. As a result of these deprivations, the Plaintiff suffered from emotional distress, nightmares, suicidal thoughts, insomnia, insect bites, extreme headaches, itchy dry skin and rashes, and loss of weight. *Id.* at ¶¶ 114-31.

During a routine tour of the segregation unit, the Plaintiff asked Warden Butricks and Salvatore why he and other inmates in segregation had to deal with so many deprivations. Compl. ¶ 74. Butricks stated that MYI is run differently than the adult prisons and that he "see[s] no problem with the way that Joanne[2] punishes the youth who break . . . rules and policies." *Id.*

On July 18, 2018, the Plaintiff was released from the administrative detention portion of his segregation placement and placed on transfer detention status. Compl. ¶ 75. While on transfer detention status in the segregation unit, he was subjected to the same deprivations. *Id.*

On July 24, 2018, the Plaintiff was transferred from the segregation unit at MYI to the SRG housing unit at MWCI. Compl. ¶ 92. Prior to leaving MYI, the Plaintiff requested to review his property matrix and verify the contents of all of his personal property, but MYI staff refused to grant his request. *Id.* at ¶¶ 92-93. When he arrived at MWCI, he noticed that his television and A/C adapter were not listed on his property matrix. *Id.* at ¶ 94. MWCI staff was unable to determine the status of his missing property and told the Plaintiff to file a lost property claim. *Id.* at ¶ 95. Afterward, the Plaintiff was escorted to the SRG housing unit at MWCI. *Id.* at ¶ 96. When on route to the SRG unit, the escorting officer told the Plaintiff that there were no inmate request forms, lost property claim forms, or administrative remedy forms in the unit and that the Plaintiff would have to wait until the following day to submit a form. *Id.* at ¶ 97.

The Plaintiff was not provided with an administrative remedy form until August 2, 2018, which he used to appeal Eberle's disciplinary finding. Compl. ¶¶ 99-100. On

---

[2] The complaint does not allege any additional information on "Joanne," to whom Butricks was referring.

October 2, District Administrator Maldonado denied the Plaintiff's appeal because it was filed more than fifteen days after the disciplinary hearing on July 10, 2018. *Id.* at ¶ 102. The Plaintiff was unable to appeal Eberle's decision while in segregation at MYI because he had not been provided with writing utensils or proper remedy forms. *Id.* at ¶ 104.

Between September 26 and October 18, while at MWCI, the Plaintiff filed over seven grievances regarding his concerns, which resulted in his placement on grievance restriction. Compl. ¶ 142. He also sent a letter to Commissioner Semple describing the unlawful conditions and practices at MYI. *Id.* at ¶ 109.

### Discussion

Based upon these allegations the Plaintiff claims that the Defendants violated several of his constitutional rights. He does not separate his claims into distinct counts with identified Defendants, but he sets them forth in a reasonably orderly fashion and it is sufficiently clear against which Defendants each constitutional claim is brought.

The Plaintiff claims that Defendants Butricks, Salvatore, Fortin, Garibaldi, and Semple violated his First Amendment rights to "free speech," "free association," and free exercise of religion, and his Eighth Amendment protection against cruel and unusual punishment. These claims stem from the conditions he endured while in segregation at MYI.

The Plaintiff next claims that that Defendants Butricks, Salvatore, and Fortin denied him access to the courts under the First and Fourteenth Amendments by limiting his legal calls and mail while in segregation.

The Plaintiff also claims that Defendants White, Lis, Garibaldi, Mala, Salvatore, Butricks, and Eberle retaliated against him for his refusal to cooperate with their

investigation regarding the smuggling of CDs into MYI, in violation of his First Amendment rights. In this regard, he claims that they planted contraband in his property, found him guilty of the subsequent DR, and placed him in segregation as punishment for his refusal.

The Plaintiff next claims that Lis violated his Fourth Amendment protection against unreasonable searches by conducting a "frivolous search" of his property upon his arrival at MYI.

Finally, the Plaintiff claims that Eberle, Salvatore, Mala, and Garibaldi denied him procedural due process under the Fourteenth Amendment during the disposition of his contraband DR.

For relief, the Plaintiff seeks a declaration "that the actions of all [of] the Defendants violated the First, Fourth, Eighth, and Fourteenth Amendments [to] the United States Constitution." He seeks injunctive relief as follows: (1) removal from the administrative segregation SRG program, (2) an order expunging from his institutional record the June 26, 2018 contraband and SRG DRs and any DRs he received while in the administrative segregation SRG program, and (3) disciplinary proceedings against all Defendants in this case. He also seeks compensatory and punitive damages. The Court addresses each of the Plaintiff's claims and his prayer for relief, though not necessarily in the order in which they appear in the complaint.

### Declaratory Relief

The Plaintiff's request for declaratory relief is unwarranted. To the extent such relief is sought as a result of any of the Defendant's actions while acting in their official capacities, should relief is barred by the Eleventh Amendment. *Ward v. Thomas*, 207

F.3d 114, 119-20 (2d Cir. 2000) (Eleventh Amendment bars declaration that state violated federal law in the past). Such relief as a result of claims brought against the Defendants in their individual capacities is equally unwarranted under the circumstances presented here. Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of that right or a disturbance of the relationship." *Colabella v. American Institute of Certified Public Accountants*, No. 10-CV-2291 (KAM) (ALC), 2011 WL 4532132, at *22 (E.D.N.Y. Sept. 28, 2011) (citations omitted). It operates prospectively to enable parties to adjudicate claims before either side suffers great damages. *See In re Combustion Equip. Assoc., Inc.*, 838 F.3d 35, 37 (2d Cir. 1998). The alleged constitutional violations in this case concern only past conduct. The Plaintiff has not identified any legal relationships or issues that require resolution by declaratory relief. This portion of the prayer for relief is dismissed.

### Injunctive Relief

This Court cannot order disciplinary action against the Defendants even should a violation by those Defendants be proven. *See Osuch v. Gregory*, 303 F. Supp. 2d 189, 194 (D. Conn. 2004) (prisoner has no constitutional right to have Defendants prosecuted or disciplined). Plaintiff's prayer for relief in this regard is dismissed.[3]

### First Amendment Claims

The Plaintiff alleges that Defendants Butricks, Salvatore, Fortin, Garibaldi, and Semple violated his right to free speech, free association and interfered with the exercise of his religion in violation of his First Amendment rights. As to these Defendants his

---

[3] The remaining two requests for injunctive relief derive from his due process claims and are discussed *infra*.

allegations are conclusory in nature and do not provide any specifics as to how these Defendants violated these rights. "It is well settled . . . that personal involvement of Defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted). Although the Plaintiff alleges that he was deprived of inmate request/grievance forms and writing utensils while in segregation, he does not allege how each of these Defendants were personally involved in depriving him of such material or that the deprivation prevented him from filing complaints about the conditions to which he was subjected. In fact, he alleges that, while he was confined at MWCI in September and October of 2018, he filed several grievances and wrote a letter directly to the Commissioner. Although he alleges that he was deprived of religious services while in segregation, he does not allege how any of the listed Defendants knew about, and/or participated in, the deprivation. The plaintiff has not alleged a plausible First Amendment free speech, free association, or free exercise of religion claim.

The Plaintiff also claims that White, Lis, Garibaldi, Mala, Salvatore, Butricks, and Eberle planted the one-dollar bill in his personal property, disciplined him for possession of contraband, and placed him in segregation all out of retaliation for his refusal to cooperate with their investigation into the smuggling of CDs into MYI, and therefore, in violation of his rights under the First Amendment.

"To prevail on a First Amendment retaliation claim, [the Plaintiff] must establish (1) that the speech or conduct at issue was protected, (2) that the Defendant took adverse action against the [Plaintiff], and (3) that there was a causal connection between the protected [speech] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir.

2014) (internal quotation marks omitted); *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). "In the prison context, 'adverse action' is objectively defined as conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *O'Diah v. Cully*, 08-CIV- 941, 2013 WL 1914434, at *9 (N.D.N.Y. May 8, 2013) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)); *see alo Ramsey v. Goord*, 661 F. Supp. 2d 370, 399 (W.D.N.Y. 2009) (prisoners may be required to tolerate more than average citizens before alleged retaliatory action against them is considered adverse). The Plaintiff must state facts "suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)).

"Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient." *Riddick v. Arnone*, No. 3:11-CV-631 (SRU), 2012 WL 2716355, at *6 (D. Conn. Jul. 9, 2012); *see also Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) ("virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act"). "Accordingly, Plaintiffs in retaliatory motive cases must plead 'specific and detailed factual allegations which amount to a persuasive case' or 'facts giving rise to a colorable suspicion of retaliation.'" *Moore*, 92 F. Supp. 3d at 120 (quoting *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001)).

The Plaintiff claims that the protected conduct at issue was his refusal to

cooperate with the investigation or provide information regarding the smuggling of CDs. Refusal to cooperate with prison authorities by providing information or "snitching," is protected by the First Amendment. *Burns v. Martuscello,* 890 F.3d 77, 89 (2018). The question is therefore whether the Plaintiff has set forth sufficient factual allegations to support the inference that the disciplinary report and subsequent punishment were motivated by this protected conduct.

Plaintiff alleges that Garibaldi threatened to retaliate against him for refusing to provide information about the smuggling of contraband into MYI. Garibaldi was the officer charged with investigating the contraband DR and allegedly told the plaintiff that he was going to ensure that the hearing officer "smoked" him for making the officers' job harder. Although there are no direct allegations regarding Garibaldi's involvement in the seizure of the contraband, Garibaldi's role as the investigating officer coupled with his alleged threatened retaliation, are sufficient to state a First Amendment retaliation claim against Garibaldi in his individual capacity for damages.

However, as to White, Lis, Mala, Salvatore, Butricks and Eberle, the Plaintiff only alleges, on a conclusory basis that the Defendants conspired to plant contraband as a result of his refusal. The complaint is largely devoid of any allegations which would allow or suggest the inference that these other defendants were motivated by retaliation for the Plaintiff's refusal to cooperate with the ongoing contraband investigation at MYI. Thus, the Plaintiff's retaliation claim is conclusory and factually insufficient as to these defendants.

**Eighth Amendment**

The Plaintiff claims that the conditions in the segregation unit at MYI violated his Eighth Amendment right to be protected from cruel and unusual punishment. He alleges that he was subjected to several inhumane conditions of confinement while in segregation at MYI, including the denial of exercise, clean clothing, his breathing inhaler, and adequate plumbing. He alleges that he was also subjected to freezing temperatures and insects and that prison officials denied his requests for medical treatment.

The Eighth Amendment's prohibition on cruel and unusual punishment includes a prohibition on inhumane conditions of confinement. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). To establish an Eighth Amendment violation based upon inhumane conditions, a Plaintiff must demonstrate, that "the prison officials' transgression" was "'sufficiently serious.'" *Id.* This is an objective inquiry. *Id.* Subjectively, a Plaintiff must also demonstrate that "the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.* with 'deliberate indifference to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). "Under the objective element, while the Constitution 'does not mandate comfortable prisons,' inmates may not be denied 'the minimal civilized measure of life's necessities.'" *Alster v. Goord*, 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Thus, prison officials cannot "deprive inmates of their 'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). Prison officials cannot expose prisoners to conditions that may pose an unreasonable risk of serious damage to the prisoners' future health. *Id.* (citing *Phelps*, 308 F.3d at 185).

Here, the Plaintiff's allegations plausibly state a claim that he was subjected to inhumane conditions of confinement at MYI in violation of his Eighth Amendment rights. He alleges that he complained about these conditions to Salvatore, Fortin, and Butricks, and all three of those Defendants rejected his complaints. Therefore, the Court will permit the Plaintiff's Eighth Amendment conditions of confinement claim to proceed against Salvatore, Fortin, and Butricks in their individual capacities for damages.[4]

Although the Plaintiff purports to bring these claims against the remaining defendants, his allegations against them are conclusory and/or fail to identify their personal involvement in the constitutional violation. *See, Wright,* 21 F.3d at 501.

**Access to the Courts – First Amendment**

The Plaintiff also claims that Butricks, Salvatore, and Fortin denied him access to the courts by limiting his legal calls and mail while in segregation. "[T]o state a claim for denial of access to the courts, [the] Plaintiff must demonstrate that he suffered an actual injury . . . that is, he must allege that [the] 'Defendant[s'] conduct deprived him of an opportunity to press some nonfrivolous, arguable cause of action in court.'" *Baker v. Weir*, No. 3:16-CV-1066 (JAM), 2016 WL 7441064, at *2 (D. Conn. Dec. 27, 2016) (citation omitted; quoting *Brown v. Choinski*, No. 3:09-CV-1631 (MRK), 2011 WL 1106232, at *5 (D. Conn. Mar. 23, 2011)). "[The] Plaintiff must allege not only that the Defendant[s'] alleged conduct was deliberate and malicious, but also that [their] actions resulted in actual injury to the Plaintiff such as the dismissal of an otherwise meritorious legal claim." *Cancel v. Goord*, No. 00-CIV-2042 (LMM), 2001 WL 303713, at *4

---

[4] The Eleventh Amendment bars claims for damages against state officials in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Thus, all claims for damages against the defendants in their official capacities are dismissed.

(S.D.N.Y. Mar. 29, 2001). "[T]he injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis v. Casey*, 518 U.S. 343, 354 (1996). Here, the Plaintiff has not alleged any facts showing that the Defendants' actions prevented him from pursuing any meritorious legal claim. The First Amendment claim based upon a claim that he was denied access to the courts is dismissed.

**Fourth Amendment**

The Plaintiff claims his Fourth Amendment rights were violated by Lis. This claim is premised upon the alleged "frivolous search" of his personal property upon his arrival at MYI. "The Supreme Court has held that 'the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell,' and therefore cannot state a claim under § 1983, even if the search was intended simply to harass the inmate." *Griffin v. Komenecky*, No. 95-CV-796 (FJS) (DNH), 1997 WL 204313, at *2 (N.D.N.Y. Apr. 14, 1997) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526, 529-30 (1984)); *see also Nieves v. Booker*, No. 05-CV-00017S (Sr), 2013 WL 4604028, at *1-2 (W.D.N.Y. Aug. 28, 2013) (granting summary judgment for Defendants on former inmate's Fourth Amendment claim regarding search of personal information). The Plaintiff's Fourth Amendment claim is dismissed.[5]

**Fourteenth Amendment – Procedural Due Process**

The Plaintiff next claim is that Eberle, Salvatore, Mala, and Garibaldi denied him procedural due process under the Fourteenth Amendment during the disposition of his contraband DR. The standard analysis for a claim of a violation of procedural due

---

[5] It is unclear whether the Plaintiff also brings a Fourth Amendment claim against defendant White for the June 22, 2018 search of his personal property upon its arrival from BCC. Any such claim would fail for the same reasons articulated above regarding the Fourth Amendment claim against defendant Lis.

process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In the prison context (involving someone whose liberty interests have already been severely restricted because of his confinement in a prison), a prisoner must show in the first step that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Sandin*, the Supreme Court concluded that a prisoner who was subject to a disciplinary term of thirty days confinement in restrictive housing did not sustain a deprivation of a liberty interest that was subject to protection under the Due Process Clause. *Id.* at 486. Following *Sandin*, the Second Circuit has explained that courts must examine the actual punishment received, as well as the conditions and duration of the punishment. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

As to the second step of the analysis, the procedural safeguards to which Plaintiff is entitled before being deprived of a constitutionally significant liberty interest are well-established. Due process requires: (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of the defense, subject to the correctional institution's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *See Wolff v. McDonnell*, 418 U.S. 539, 564–69 (1974); *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).

In this case, the Plaintiff only spent twenty-eight days in segregation, less than the amount of time deemed atypical in *Sandin*.  However, the Plaintiff alleges that he endured several hardships while in segregation, including denial of medical care, clean clothing, exercise, and adequate plumbing and sanitation.  He also alleges that the segregation unit had freezing temperatures and was infested with insects.  Both the conditions of segregation and its duration must be considered in the due process context, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."  *Palmer*, 364 F.3d at 64 (quoting *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999)).  Construed liberally, the allegations show that the Plaintiff endured an "atypical and significant hardship" while in segregation at MYI.

In addition, the Plaintiff alleges facts that Garibaldi, Mala, Salvatore, and Eberle denied him proper assistance, notice of the evidence against him, and his right to call witnesses during the disposition of his contraband DR.  He alleges they prevented him from interviewing, and/or presenting testimony from, correction officers in support of his defense to the DR, and that Eberle based his guilty finding solely on the fact that the Plaintiff had previously been caught with contraband.  These allegations are sufficient at this stage to state a plausible Fourteenth Amendment procedural due process claim against Garibaldi, Mala, Salvatore, and Eberle in their individual capacities for damages and in their official capacities for injunctive relief.

**Supervisory Liability**

Finally, as alluded to *supra.,* the Plaintiff brings some or perhaps all of these claims against Semple and Maldonado under a supervisory liability theory.  A Plaintiff

who sues a supervisory official for monetary damages must allege that the official was "personally involved" in the constitutional deprivation in one of five ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct. *Wright*, 21 F.3d at 501; *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) (doctrine of *respondeat superior* does not suffice for claim of monetary damages under section 1983).  Although he alleges that he sent Semple a letter outlining his concerns, there are no other facts alleged which would satisfy these criteria.  *See Sealey v. Gilner,* 116 F.3d 47, 51 (2d Cir. 1997) (two letters sent to supervisor Defendant and Defendant's brief response do not demonstrate requisite personal involvement for § 1983 claim); *Lebron v. Semple*, No. 3:18-CV-1017 (JAM), 2018 WL 3733972, at *4 (D. Conn. Aug. 6, 2018) ("Courts have held that [a] failure to respond to a letter of complaint does not constitute the personal involvement necessary to maintain a section 1983 claim") (quoting *Richardson v. Department of Correction*, No. 10-Civ-6137 (SAS), 2011 WL 710617, at *3 (S.D.N.Y. Feb. 28, 2011)).  In addition, the claim against Maldonado is solely based on the denial of the Plaintiff's appeal from Eberle's guilty finding.  This is insufficient to establish knowledge of any constitutional deprivation.  *See Manley v. Mazzuca*, No. 01-CV-5178 (KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007).  As a result, the complaint

does not contain any plausible claims against Semple and Maldonado and they shall be terminated as Defendants.

**Orders**

(1) The Eighth Amendment claim for inhumane conditions of confinement may proceed against Salvatore, Fortin, and Butricks in their individual capacities for damages. The First Amendment retaliation claim may proceed against Garibaldi in his individual capacity for damages. The Fourteenth Amendment procedural due process claim may proceed against Garibaldi, Mala, Salvatore, and Eberle in their individual capacities for damages and in their official capacities for injunctive relief. All other claims are dismissed. The Court is directed to terminate Semple, Maldonado, Lis, and White as Defendants to this action.

(2) The Clerk shall prepare a summons form and send an official capacity service packet, including the complaint, to the United States Marshal Service. The U.S. Marshal is directed to effect service of the complaint on the Defendants in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within **twenty-one (21) days** from the date of this order and to file a return of service within **thirty (30) days** from the date of this order.

(3) The Clerk shall verify the current work address for Salvatore, Fortin, Butricks, Garibaldi, Mala, and Eberle with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint (DE#1) to them at the confirmed addresses within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver requests on the **thirty-fifth (35) day** after mailing. If any Defendant fails to return the waiver request, the Clerk shall make arrangements for in-

person service by the U.S. Marshals Service on him/her, and he/she shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(4) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(5) The Defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the Defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(6) Discovery, pursuant to Fed. R. Civ. P. 26-37, shall be completed within **six months (180 days)** from the date of this order. Discovery requests need not be filed with the Court.

(7) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this order.

(8) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9) If the Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that the Plaintiff MUST notify the court. Failure to do so can result in the dismissal of the case. The Plaintiff must give notice of a new address even if he is incarcerated. The Plaintiff should write "PLEASE NOTE MY

NEW ADDRESS" on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 4th day of January 2019.

_____/s/_____
Kari A. Dooley
United States District Judge